IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN SOUTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-3465-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Steven Souter seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in improperly determining plaintiff's residual functional capacity because plaintiff gets angry with supervisors and employers and he needs a "fairly stress-free environment," and in failing to give controlling weight to plaintiff's treating psychologist, Cheryl Thornton, Psy.D. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On January 8, 2009, plaintiff applied for disability benefits alleging that he had been disabled since January 28, 2008. Plaintiff's disability stems from depression and vertigo. Plaintiff's application was denied on April 28, 2009. On September 16, 2010, a hearing was held before an Administrative Law Judge, and a supplemental hearing was held on December 20, 2010. On January 27, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 22, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

>>Yes = not disabled.
>>No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>>No = not disabled.
>>Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

>>Yes = disabled.
>>No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

>>No = not disabled.
>>Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

>>Yes = disabled.
>>No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1966 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1966 | $ 567.59 | 1989 | $ 415.00 |
| 1967 | 2,302.71 | 1990 | 1,465.00 |
| 1968 | 3,576.32 | 1991 | 1,145.00 |
| 1969 | 3,701.08 | 1992 | 8,754.00 |
| 1970 | 4,991.36 | 1993 | 13,370.00 |
| 1971 | 3,857.94 | 1994 | 13,832.25 |
| 1972 | 6,349.00 | 1995 | 859.00 |
| 1973 | 7,055.15 | 1996 | 14,923.93 |
| 1974 | 3,593.25 | 1997 | 30,177.73 |
| 1975 | 8,295.34 | 1998 | 24,709.90 |
| 1976 | 10,745.16 | 1999 | 16,608.21 |
| 1977 | 7,354.52 | 2000 | 17,788.98 |
| 1978 | 17,700.00 | 2001 | 20,340.04 |
| 1979 | 22,045.00 | 2002 | 4,721.00 |
| 1980 | 13,800.00 | 2003 | 12,498.00 |
| 1981 | 5,916.00 | 2004 | 7,492.00 |
| 1982 | 6,066.00 | 2005 | 15,849.00 |
| 1983 | 16,836.00 | 2006 | 0.00 |
| 1984 | 14,788.00 | 2007 | 0.00 |
| 1985 | 2,778.00 | 2008 | 0.00 |

4

|      |           |      |      |
|------|-----------|------|------|
| 1986 | 14,325.00 | 2009 | 0.00 |
| 1987 | 3,212.00  | 2010 | 0.00 |
| 1988 | 0.00      |      |      |

(Tr. at 155, 160).

## Function Report

In a Function Report dated February 15, 2009, plaintiff reported that he takes care of his parents (Tr. at 195-202). He has no problem with personal care. He needs no special reminders to take care of personal needs, grooming or to take medicine. He prepares complete meals daily for three hours. His cooking habits have not changed due to his condition. He does laundry weekly without assistance. He does not do yard work because it is too hot. He goes outside as often as possible. He drives a car and can go out alone. He shops in stores for food. He is able to pay bills and count change. He watches television and reads "all day." When asked, "Do you have any problems getting along with family, friends, neighbors, or others?" plaintiff checked, "No" (Tr. at 200). His condition affects his ability to lift, squat, walk, and kneel. It does not affect his ability to bend, stand, reach, sit, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, or get along with others (Tr. at 200). When asked how long he can pay attention, he wrote, "AS long as I'm awake." He follows written and spoken instructions "good." He gets along with authority figures "good." He has never lost a job because of problems getting along with other people. He does not handle stress very well, but he handles changes in routine "good." He uses a cane when walking long distances. It was prescribed in 2006.

## Missouri Supplemental Questionnaire

In a Missouri Supplemental Questionnaire dated February 15, 2009, plaintiff reported that he had not received any treatment since he filed his claim (Tr. at 203-205). He reported that he plays video games, puzzles, or uses a computer for five to six hours at a time each day.

5

He has a valid driver's license and is able to drive.

**B.    SUMMARY OF MEDICAL RECORDS**

On May 7, 2007, plaintiff saw William Campbell, D.O., to get lab results and for a follow up on high blood pressure (Tr. at 250). Plaintiff reported drinking a half a pint of vodka per day and said he had a lot of acid reflux. He was smoking one pack of cigarettes per day. Plaintiff's blood pressure was 139/95. He was diagnosed with hypertension, gastroesophageal reflux disease, depression and hyperlipidemia. Dr. Campbell told plaintiff to discontinue hydrochlorothiazide for hypertension and prescribed Micardis.

January 28, 2008, is plaintiff's alleged onset date. However, the earliest post-alleged onset date medical record is from a consulting physician 14 months after plaintiff's alleged onset date.

On March 21, 2009, Anthony Zeimet, D.O., examined plaintiff in connection with his disability application (Tr. at 253-256).

> Mr. Souter is a pleasant 60-year-old male who . . . notes that he had a stroke back on May 9, 2005. His only residual deficit is chronic left leg weakness. He states that his left leg gives him some problems, primarily the knee areas, and he a [sic] fallen a few times. . . . [T]he patient denies having any hearing problems and then he states that he is going deaf over time, but that he was prescribed hearing aids in the past, but he does not like them, and he does not like to use them. When I rubbed 2 fingers near both ears, he was able to detect that and furthermore he can hear normal conversational tone.

> On a self-questionnaire, the patient states that in an 8-hour day, he can sit for about 6 hours at one time during the day, stand for about 6 hours at one time during the day, and only walk for about 30 minutes at one time during the day. He states he can lift and carry about 50 pounds. . . He can climb stairs. He uses a cane to get around. . . . He does admit to smoking. He does drink alcohol occasionally. He can drive a car.

> PAST MEDICAL HISTORY:
> 1.    History of stroke.
> 2.    Hearing problems.

> \* \* \* \* \*

> CURRENT MEDICATIONS:  None.

REVIEW OF SYMPTOMS:  As above.  Otherwise, negative.

SOCIAL HISTORY:  Positive for tobacco 1 pack per day for 45 years.  He denies use of illicit substance but has used alcohol in the past at 1 beer a week.

Plaintiff's blood pressure was 141/100.  He was 5 feet 10 inches tall and weighed 130 pounds.  He was alert and oriented times three and in no apparent distress.  He was able to get on and off the exam table and up and out of the chair without much difficulty.  "[H]e is able to walk without much difficulty even without the cane."  Plaintiff's heart and lungs were normal.  He had normal strength in his extremities, no muscle atrophy, no spasm, no tenderness.  He was able to follow simple directions.  His affect was good.  "He is not anxious or nervous, and he has good personal hygiene."  Plaintiff had no limitation in his range of motion in upper or lower extremities.  Plaintiff was "able to walk without any assistive device, is able to do heel-to-toe walk, walk on his heels and toes.  He has the ability to squat."  Plaintiff had normal range of motion in his cervical and lumbar spine, straight leg raising was normal.  He could "walk for small distances without the use of the cane. . . .  It should be noted that patient lives with his parents but takes care of them."

Dr. Zeimet diagnosed:

1.      Left lower extremity weakness.
2.      History of cerebrovascular accident [stroke].
3.      Mild hearing difficulty.
4.      Hypertension, uncontrolled.
5.      Tobacco abuse.

IMPRESSION:  I do believe that the patient gave a good effort on examination today. With regard to the patient's ability to work an 8-hour day with normal breaks to sit, stand and walk; I think he can work a normal 8-hour day.  I really think he has just a minor residual weakness in his left lower extremity. He is able to get around without much difficulty with and without the use of a cane. With regards to the patient's ability to lift and carry weight; he self-reports that he can carry 50 pounds.  I make no restriction [for] him at this time.  He did not have any limitation in range of motion including squatting.  His gross and fine motor hand grip and grasp are intact.  He does use a cane for ambulation though I think for short intervals, he may not need to use that.  For longer intervals, it is probably wise for him to continue the use of the cane.

7

His vision is corrected to normal. His hearing is intact. His communication skills are fair. He does have the ability to travel and drive a car.

On April 16, 2009, plaintiff was evaluated by David J. Lutz, Ph.D., a clinical psychologist, in connection with his disability application (Tr. at 262-266).

PRESENTING PROBLEM: Mr. Souter . . . reported that he suffered a cerebral vascular accident about four years ago. He stated that his condition has deteriorated since that time. He explained that he cannot get down on his knees as he could in the past. He did not believe that much psychologically had changed since the stroke. He indicated that his mood has remained stable, but he is easily irritated. He explained that he gets upset with his parents and his sister, which has been typical for him. He described his anger "as kind of nasty," but suggested that it has caused him problems primarily at home. He stated that he is more likely to become angry with bad news rather than become depressed, and did not describe any substantial problems with depression. He did not report any manic symptoms. He described himself as anxious primarily because he worries about external stressors, especially financial issues. He denies any problems with worry or anxiety prior to his financial difficulties. He felt that his memory and cognitive functioning are similar to what they have been in the past. He felt that he has had some decline due to age, such as not remembering someone's name.

HISTORY: . . . Mr. Souter reported that he drinks one beer occasionally with his last usage having been the day prior to the interview. He stated that he might have as many as two beers if someone can drive him home. He indicated that he drank excessively until two years ago, when he was charged with his second DUI. He stated that prior to that time, he would drink a six pack of beer daily. He indicated that he experienced blackouts, but denied having experienced withdrawal symptoms. He stated that about 12 years ago, he participated in an inpatient substance abuse treatment program. He explained that he was drunk and became suicidal. He believed that the treatment program helped because, "I divorced my wife." He stated that he had to participate in SATOP[1] as a result of the DUIs. He denied any illicit drug usage, prescription drug abuse, use of inhalants, or other problems with the law.

Mr. Souter denied having been hospitalized in a psychiatric hospital other than the substance abuse program. He said that until six months ago, he participated in outpatient psychological care related to problems between him and his parents. He explained that his father suffers from Alzheimer's disease. He denied any suicidal behavior.

Mr. Souter denied having experienced significant hallucinations, paranoia, delusions, ideas of reference, compulsions, or obsessions. . . .

---

[1]Substance Abuse Traffic Offender Program

8

FAMILY HISTORY: Mr. Souter reported that he has lived with his parents. He explained that his parents had moved out of the house, but returned to live with him after his wife left. . . .

PHYSICAL COMPLAINTS: Mr. Souter reported that he is not currently taking medications. He indicated that many years ago, he took Zoloft for about a year, but was not sure whether this medication was effective. . . .

EMPLOYMENT HISTORY: Mr. Souter reported that he worked as a carpenter, truck driver for 12 years, and then owned his business as a carpenter. He explained that at one time he had seven employees, but could not continue because of his physical limitations after the CVA [stroke]. He returned to driving a truck until about a year ago. He explained that he was caught with an expired physical examination and had some other difficulties. He stated that he generally got along well with supervisors and coworkers on his different jobs "unless they pissed me off."

DAILY ACTIVITIES: Mr. Souter reported that he gets up around 4:00 a.m., and spends time on the computer where he reads the news and sends messages on posting boards. He indicated that he visits his parents later in the morning, and then does errands. He said that he drinks about 15 to 20 cups of coffee daily, but did not report caffeine related problems. He said that he prepares the family's meals, as he cooks for his parents. . . . He stated that in the afternoon and evening, he watches television. He stated that he spent time reading in the past, but has lost some interest in reading. He indicated that as recently as two years ago, he sometimes read a book a day. He said that his father shops for the family. He reported that he goes to bed at various times. He explained that he lies on his bed and watches television, and sometimes falls asleep as early as 5:00 p.m. He indicated that he gets to sleep easily, and generally stays asleep well.

MENTAL STATUS: . . . Mr. Souter arrived on time for the interview, stating that he drove unaccompanied. . . . He was responsive and cooperative. He exhibited an appropriate range of affect, and smiled several times. His insight and judgment are likely fair, although he has had considerable difficulty with both in the past. He might be excessively irritable, but otherwise did not evidence any obvious difficulties. He seemed to understand and respond to normal conversation. I wondered about possible word-finding difficulties once, but he did not evidence anything substantial throughout the rest of the interview. His thoughts were logical and consistent. He did not exhibit any significant distressed affect or unusual or bizarre behavior. He stated that his behavior during the interview was consistent with his behavior in general, stating, "You haven't pissed me off yet."

FINANCIAL AFFAIRS: . . . He denied currently receiving assistance, and is getting ready to file bankruptcy. . . .

DIAGNOSIS: Based on the client's subjective report of an extensive history of alcohol usage and observations of limited difficulties during this examination, the most appropriate diagnoses are likely to be:

9

Axis I:    Alcohol dependence possibly in sustained, full remission
           Denied any excessive usage for two years although his history has been
           problematic; obviously this indication of remission relies on his self-report.
           He denied any substantial problems related to the CVA.

Axis II:   None . . .

Axis III:  Cerebral vascular accident

Axis IV:   Unemployment, physical difficulties, limited interpersonal contact, financial
           difficulties

Axis V:    GAF = 70[2] (current)
           Mild to transient symptoms currently if his self-report is accurate

MEDICAL SOURCE STATEMENT:   Mr. Souter seemed able to understand and
remember simple and moderately complex instructions and probably complex
instructions.  He seemed able to sustain concentration and persistence on simple and
moderately complex tasks and possibly complex tasks. He seemed able to interact in
most social situations.  He seemed able to adapt to his environment.

On April 28, 2009, Lester Bland, Psy.D., found that plaintiff's mental impairment was

not severe (Tr. at 270-280).  In support of his findings, Dr. Bland noted that plaintiff has a

history significant for alcohol abuse, reporting consuming a 1/2 pint of vodka daily two years

after his stroke.  He had no history of inpatient psychiatric treatment.  He was involved in

family therapy briefly with his parents in 2008 to work on relationship issues.  "Records were

requested but not provided."  Dr. Bland summarized the findings of Dr. Lutz from 12 days

earlier.  He pointed out that plaintiff cares for his incapacitated parents, also takes care of

personal grooming, cooks complete meals, does laundry, drives, runs errands, uses the

computer regularly five to six hours per day, and shops.  He is able to follow instructions well,

alleges no difficulty getting along with others, does not require frequent reminders, and is

able to adapt to change.

_____

    [2]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g.,
depressed mood and mild insomnia) or some difficulty in social, occupational, or school
functioning (e.g., occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal relationships.

On June 11, 2009, plaintiff saw Cheryl Thornton, Psy.D., at Burrell Behavioral Health (Tr. at 341-347). Plaintiff had seen Dr. Thornton in the past with his parents and his sister, and Dr. Thornton continued to treat his parents and speak to plaintiff's sister (Tr. at 339, 341).

Presenting Problem and Services Desired:
Client has recently filed for Social Security Disability and [they] denied his claim. . . . Client agrees that one of his biggest problems would be anger issues. He then said rather emphatically, "I don't like stupid people." He indicated that he has always been like this; easily angered with a low tolerance for frustration, but indicated it has been getting worse. Client has had a significant number of problems with relationships. He has had problems with employers and for those who work for him. Client was talking about drivers he had hired for his trucking company, "When they fuck up, I'm short with them. If they do their job, I'm generous." . . . Client has experienced a lot of stressors within the last year. Client was involved with a housing development on his parents' land that had required a significant amount of money to develop, and due to the housing economy, they have not been able to sell the lots. There is a situation in which they are not sure if they bank is going to take them back or not, and he has had more financial stressors than he has ever had before. Client began to talk about someone who had made them a "low-ball offer" on some of the property, and it made him angry. He said, "I get pissed at people who do things like that." Client had a difficult time defining his problems.

. . . He has no money; has to ask his parents for money, and that's humiliating to him. . . .

When this therapist inquired about the services client desires, he had a difficult time defining what he would want out of services, he laughed out of anxiety and stating dogmatically that he liked being angry; he doesn't want to do anything about that. . . . Also noted are his parent's report of client not having any ambition and mainly staying in his part of the house and watching TV and spending most of his time with his dog. He appears to be isolating himself.

History of Present Illness:
Client stated he has always had problems with anger. He said [he] has always escalated quickly and now he seems to be escalating even quicker. His anger has gotten him into problems before in his past. He has been sent home and dismissed from jobs. He was told one day that he needed to leave the job sight due to becoming angry at another driver, and holding up a gun. He also discussed times when he got into physical fights with another driver who actually attacked him because he did not like what he had said to him. . . .

Medical History:
. . . He also stated that he is not currently on any medications. . . .

11

Legal Issues:

Client did not check on his psychosocial history form that there is legal involvement, but client is involved in financial legal issues; has a judgment against him, and is possibly filing for bankruptcy, and so these are very stressful issues for him at this time.

Pertinent Family and Social History:

. . . Client has lived in the basement of his parents' home for a considerable amount of time, possibly three years at this time. It has not been easy living in the same home as his parents for client or for his parents. His parents are aging and his father is hard of hearing. Client finds himself becoming very stressed and angry at his parents. He has a low frustration tolerance, especially with his father's hearing problems. . . . Client stated that his parents used to come down and check on him quite often and this would irritate him. This is an issue that this therapist had worked with sometime ago and he is pleased that his parents no longer come downstairs. He has been trying to help some with meals for his parents and with doing some of the odd jobs; however, it is often difficult for client to understand the needs of his elderly parents and he is not a natural caretaker. He is not someone who might identify with another person or be able to anticipate a problem before it arises. Client is not empathetic or sympathetic toward others. This therapist has encouraged client to recognize his limitations. Client listed his main support system as being his sister [who lives in Florida] whom he talks to daily. . . .

Substance Abuse:

Client admitted to current use of alcohol. He says he drinks a "little daily" and does this to calm himself. He says it settles him down. He reports that he drinks a half a pint of Vodka daily throughout the day. He also admits to the use of Nicotine (cigarettes).

Risk Assessment:

. . . This therapist asked the question whether he had availability to guns or not, and he said yes, that he does, and that he does not want to give them up. He feels safer with them at the house. This therapist asked client if he became very distressed and was contemplating any thoughts of hurting himself, would he talk to this therapist about it, and he agreed he would do so. Client's suicide risk will continue to be monitored as he has indicated problems and risk factors with the alcohol use with having access to weapons, and some impulse control problems, although he currently is able keeps [sic] control physical impulses, but has a difficult time controlling verbal impulsivity. The referral sheet came from intake stating "uses a lot of fowl language." . . . He also has access to weapons, has financial problems, is self medicating with alcohol, and has physical problems. This therapist will continue to monitor on a weekly basis. A positive factor as far as risk is that the major impact of the financial loses [sic] is over and his sister has assumed the role of taking care of the business and client does not have to do so. He has a strong support system mainly his sister Rita whom he reports he talks to about three times a day. . . .

12

<u>Functional Strengths and Limitations:</u>
   . . . His limitations are anger, his inability to maintain relationships, and his inability to tolerate what he refers to as "stupid people," and he has a difficult time when somebody doesn't agree with him.

<u>Mental Status:</u>
   . . . There were no noted problems with gait or motor as client walked into the session.

Despite noting that plaintiff's mood and affect "appeared to be more anxious than depressed", she assessed him with major depressive disorder, recurrent, moderate. "More than likely, client fits the diagnosis of 296.32 Major Depressive Disorder due to **reporting** the following symptoms: Agitation, irritability, suicidal ideations, lack of ambition, not eating and losing weight and isolating." (emphasis added) She also assessed relational problems not otherwise specified, alcohol abuse, and nicotine dependence. Without having administered any tests, she assessed personality disorder not otherwise specified. "The diagnosis of a Personality Disorder NOS is due to client not having enough criteria for Narcissistic Personality Disorder." His Axis IV issues were problems with family, problems with occupation, problems with housing, other environmental and psychosocial problems, problems with finances, and legal problems. She assessed a GAF of 48.[3]

On June 16, 2009, plaintiff saw Dr. Thornton for individual therapy for the first time (Tr. at 339-340). She observed that plaintiff laughed and joked and was pleasant although he made crude comments at times. "We discussed the treatment plan and he was somewhat difficult as client has a difficult time seeing he has any problems. He knows how he affects others, does not see that as a problem just as the way he is. He admits to anger, and a very low tolerance level for people who do not see things his way. . . . He did respond to the

---

[3]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 6:11-cv-03465-REL   Document 17   Filed 02/19/13   Page 13 of 55

encouragement somewhat concerning he could not predict the financial plunge and the problems with the [housing] development." Plaintiff agreed to see about Meals on Wheels for his parents as well as seeing if Medicare would provide after care for his mother since her hospitalization. "He claims he yells because his dad cannot hear."

On June 23, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 338). Plaintiff participated appropriately in the hour-long session. Plaintiff admitted he needed to stop self medicating with alcohol. He said he knew his anger had affected all of his relationships. He had received an email from his ex wife indicating that she would like to be close to him again if he could do something about his problems. This made plaintiff happy. Dr. Thornton said she would get plaintiff some information about how he can discontinuing self medicating and talked about possibly starting antidepressant medication. Plaintiff agreed to see if he could get on Medicaid.

On June 30, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 337). Plaintiff participated appropriately in the hour-long session. Dr. Thornton observed that plaintiff seemed less anxious "possibly because he is getting more relaxed with this therapist." He used curse words not in anger but in normal conversation. He participated appropriately, smiled, talked about his anger at the bank. Dr. Thornton recommended plaintiff leave the room when his father was getting stubborn, which irritates plaintiff, and allow his sister to deal with the bank. Plaintiff said he knew he needed to stop self-medicating (with alcohol) but he does not like pills.

On July 7, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 336). Plaintiff participated appropriately in the hour-long session. Plaintiff said he gets frustrated with his parents. He was trying not to think about the "bank situation" and was encouraged to let his lawyer and his sister take care of it. Plaintiff said not having his trucking business

14

anymore made him mad. Plaintiff admitting being cranky with his parents sometimes. "Client is continuing his pursuit of getting help for his self medicating problems. He is looking to go into treatment soon and continues to be motivated to do so."

On July 17, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 335). Plaintiff participated appropriately in the hour-long session. "He discussed not pursuing the substance abuse treatment at this time, but that he still wants to do so." Plaintiff had gotten angry at his dad once the previous week and said he gets "pissed off" because his parents are "slipping." "This therapist told client that he is not a caretaker and does not have the tolerance for caring for others and his parents were more than likely at some time will need to have more assistance in the home. . . . He continues to be willing to go in to substance abuse treatment. He has applied for Medicaid. His mother and father are very capable of making their own decisions and continue to travel to the casinos and where they need to go. They want their son to get help and stated that he has improved and is somewhat more pleasant since being in therapy."

On July 24, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 334). Plaintiff participated appropriately in the hour-long session. Plaintiff talked about his leg being weak and said he should have brought his cane with him. Plaintiff said he had had no anger issues the previous week. Plaintiff said he was sad about not driving a truck anymore.

On July 31, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 333). "He smiles although he gives the impression that he could become angry any moment." Plaintiff described one incident when he involved himself in a disagreement his parents were having. Plaintiff's mother had told Dr. Thornton that she is loud because her husband cannot hear. "He was reminded that he does not have the skills to be a caretaker."

15

On August 4, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 332). Plaintiff participated appropriately in the hour-long session. They discussed plaintiff's frustration with his father. He said he had no use for his daughter and little use for his son. Plaintiff's parents had reported seeing some improvement with plaintiff. "Client responds well to this therapist but has notified this therapist that if I push his buttons the[n] she will see his anger." Dr. Thornton indicated in her records that she was prepared for a possible verbal outburst.

On August 11, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 330-331). Plaintiff participated appropriately in the hour-long session. Plaintiff told Dr. Thornton that his cousin had recently died. He admitted having crying spells since his stroke. He said he cried about how the press was treating Hilary Clinton and he cried during television shows. Plaintiff said his anger had been less intense during the past week, although he had gotten irritated at his dad for using a handicapped parking spot when plaintiff's mother was not in the car. "He told this therapist that he had cut down on his drinking and indicated he is still planning on doing something about the drinking but he is not sure he wants to resume the relationship with his ex. . . . This therapist told client that he needed to quit drinking for himself and he agreed. His ex had indicated that if he would quit she would consider reconciliation." Dr. Thornton observed plaintiff joking with her administrative staff when he made his next appointment. "This therapist will attempt to increase client's motivation for rehab. . . . This therapist told client that he should be as clear minded for the [psychological] eval as possible and to consider his alcohol intake around the testing time. Plan: Goal is to help client cease self medicating and be willing to take medications for his depression and anger."

16

On August 18, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 329). Plaintiff participated appropriately in the hour-long session. Plaintiff said his mom had fallen and he was upset because he felt his father was not concerned enough about plaintiff's mother. "Client and this therapist talked about his resistance to follow through with substance abuse treatment" and Dr. Thornton reminded plaintiff that alcohol is a depressant. "His anger continues to be a problem. . . . Client has a scheduled appointment with a doctor to possibly get medicaid services."

On August 20, 2009, plaintiff saw Dorinda Faulkner, M.D., for an evaluation in his effort to get Medicaid (Tr. at 298-301). His chief complaint was left sided weakness secondary to a stroke in 2005. Physical therapy had not been required. Sometimes plaintiff's left leg will spontaneously give out upon weight-bearing or it will not move forward in normal stride and he falls -- this occurs about once a month. Plaintiff said he was diagnosed with depression two months ago -- he gets angry "which is unusual for him" and he suffers crying spells. He was on no medications. "He states he can walk 'forever' with his cane; he later adds, 'I might have to sit down to rest, I might get out of breath.'" Plaintiff said he could sit for any length of time without difficulty. Plaintiff continued to smoke a pack of cigarettes a day. "He admits to drinking 1 pint of alcohol, or 6 beer[s] on a daily basis for the past 39 years." Plaintiff smelled of tobacco and alcohol. Dr. Faulkner performed a physical exam, blood work, and urinalysis. "Strength against resistance is slightly reduced in his left leg compared to his right. However, effort is questionable. Initially slightly reduced left upper extremity strength against resistance; not on repeat evaluation." Dr. Faulkner assessed status post CVA, hypertension, depression, alcoholism, lymphopenia, elevated liver transaminases, and abnormal urinalysis. "Based on the history provided, examination performed and information obtained, I do not believe Mr. Souter is functionally disabled from working."

17

On August 24, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 328). Plaintiff participated appropriately in the hour-long session. Plaintiff expressed frustration over his parents' issues. Plaintiff's frustration comes from being the kind of person who likes to fix things and being unable to "fix" his mom and dad. "This therapist continues to see that caring for client's parents is too stressful for client. . . . This therapist continues to encourage all family members to contact the doctor to get home health care on board to assist. This therapist told client that she would be calling the sister and seeing if she can help with getting mom to accept more help." Plaintiff said he had gone to the appointment for Medicaid services, he liked the doctor who did the exam and he believed that she had been "very thorough."

On August 29, 2009, plaintiff saw Lin Hogan, Psy.D., at Burrell Behavioral Health for a psychological evaluation at the request of Dr. Thornton (Tr. at 323-327).

PRESENTING PROBLEM
Mr. Souter reported he had originally sought counseling "because the lawyers told me I needed to get disability status" and to obtain counseling services. When asked about mental health problems, Mr. Souter reported "I've always been quick to anger, but I was not depressed until I sold my equipment and lost my trucks in January, 2008." He reported having anger problems all his life, "even as a little kid." . . . Mr. Souter is currently angry with the bank because he had to return business trucks, thereby losing equity in them. Mr. Souter reported a history of depression since he returned his trucks to the bank. . . . Mr. Souter describes his typical day begins around 3 am when he wakes up and "blogs" on his computer. Around 9 am he goes to the store, returns home and watches TV all day eventually falling asleep around 5 pm. He reported sleeping about eight hours per day. He denied feeling like he "has the blues" or isolating. He reported "crying a lot", especially when watching TV shows such as Little House on the Prairie. . . . Mr. Souter confirmed a history of suicidal ideation with his last episode about two months prior to this interview. His father has Alzheimer's disease and they often "get into it and I get aggravated at his not remembering". Mr. Souter often feels irritable and aggravated "really bad". He reported one incident when he was arguing with his wife, "she called my parents and that pissed me off so I threatened to commit suicide. I was drinking and had a gun in my hand". Mr. Souter reported a history of anxiety "regularly" for the last year. He reported his anxiety started when the economy went bad which affected the family real estate business.

18

## PSYCHIATRIC/MEDICAL HISTORY

. . . Records indicate Mr. Souter was admitted to Doctor's Hospital in Springfield, Missouri in 1997 due to suicidal ideation/intent secondary to alcohol use. His total length of stay was approximately only month. . . .

## BACKGROUND INFORMATION

Personal History

. . . In 2005, he had a construction business, and although at one point it was a "booming business", he eventually could not do the work. He reported, "I had a crew of eight but it got to where I could not physically do the work". "I could not get up and down, so I turned it over to my help". I checked on them every day but they "stole me blind". He eventually sold the business and bought a dump-truck which he operated for about 1.5 years. Eventually, Mr. Souter was charged with a DWI and lost his license. He later bought two other trucks but when the bottom fell out of the economy, in January, 2008, he returned the trucks to the bank. He has been unemployed since then. Currently Mr. Souter works mowing the grass at a family-owned subdivision. In addition, Mr. Souter reported he is a caregiver for his parents but feels "stuck" having to do it. . . .

## SUBSTANCE ABUSE HISTORY

Mr. Souter reported first using alcohol when he turned age 21. He drank "off and on" over the years having some periods of abstinence. When he worked as an over-the-road trucker, he reported never drinking when driving. However, when he was home, he drank till intoxicated. Mr. Souter reported a history of black-outs and in 1994 was admitted to Doctor's Hospital for problems related to alcohol abuse. He subsequently stopped drinking for about one year. During that time he attended Alcoholics Anonymous and had a sponsor. Mr. Souter reported currently using alcohol daily stating, "I have to have alcohol every day", and "without it I would be unhappy". He described a time when he went out of town to pick up his brother-in-law, and due to not having alcohol, had "a grueling three days". He described finding relief by stopping in the middle of the day, buying a bottle of vodka, and drinking it in a hotel room. He does not drink till intoxicated anymore, adding, "I never drink before 9 am either". Mr. Souter reported trying marijuana and not liking it because it made him sick. He reported a history of using "crank", initially in 1994. He used crank for about one year and eventually found he could not drive the truck without it. Mr. Souter has smoked about one pack of cigarettes per day since age 15. In addition, he drinks about two pots of coffee per day.

## MENTAL STATUS

Mr. Souter arrived on time for his scheduled appointment. He presented appropriately dressed and groomed. He was alert and oriented to person, place, and time. Conversational speech was fluent and spontaneous, with appropriate tone, volume, and flow. Receptive language appeared intact. He never requested repetition of test items and responded appropriately when given directions. Thought processes appeared logical and with no apparent cognitive disengagement during testing. He seemed to have an adequate level of insight and remained cooperative throughout the evaluation. He evidenced adequate energy and concentration throughout the evaluation, and appeared appropriately motivated to perform to the best of his abilities.

He did not evidence any thought disturbance or psychotic process during the interview. He exhibited mood and affect within normal limits for the duration of the evaluation. However, Mr. Souter exhibited some mild irritation during the *Inquiry* portion of the Rorschach Inkblot Diagnostic administration. He quickly regained his composure and continued with the tests. Mr. Souter denied any suicidal or homicidal ideation.

Plaintiff's testing showed no cognitive impairment and normal cognitive abilities. Dr. Hogan found that plaintiff "may suffer from low-frustration tolerance" and limited self control. His emotional stress is predisposing him to depression. He is experiencing worrisome thoughts that "may be" impairing his ability to concentrate.

For the most part, Mr. Souter displays the ability to think logically and coherently. Test data indicates a tendency for him to overvalue his personal worth and to become preoccupied with his own needs at the expense of the needs of others. In addition to these narcissistic traits, he is likely to exhibit a sense of entitlement and a tendency to externalize blame and responsibility. . . . As previously noted, Mr. Souter exhibited episodes of irritation and frustration during the *Inquiry* portion of the Rorschach Inkblot Diagnostic test. Specifically, during administration of Card II, when asked by this examiner, "What makes it look that way to you?", Mr. Souter stated, "*Because it just does, I'm getting exasperated.*" In addition, during the administration of Card IV, Mr. [Souter] stated, "*I really wish the sociologist who examined me for disability had done this so he would have seen my anger and exasperation.*" . . . [E]ven though he has the capacity to establish close, intimate, and mutually supportive relationships with others, he appears to be experiencing more needs for closeness than are being met in his present circumstances. Consequently, he is likely to be feeling lonely, emotionally deprived, and in need of others which may be predisposing him to be angry and depressed.

Dr. Hogan found that plaintiff "over-reported" on the MMPI-2 RF. "There is evidence of excessive inconsistency because of the fixed false responding to the 26 pairs". The MMPI-2 RF is to determine symptoms of social and personal maladjustment and to identify appropriate treatment planning; however, it was invalid.

Dr. Hogan assessed Major Depressive Disorder, Recurrent, Moderate; Anxiety Disorder not otherwise specified; Alcohol Dependence; and Nicotine Dependence. On Axis IV, Dr.

Hogan found moderate problems with family and severe occupational problems. Plaintiff's current GAF was assessed at 50.[4]

> SUMMARY
> Mr. Souter . . . is currently experiencing significant problems in his ability to manage both internal and external stressors in his life. Due [to] his lack of coping resources, Mr. Souter is having recurring episodes of elevated irritability, frustration, and anger. These symptoms are most likely related to mood and affective dysregulation secondary to his chronic use of alcohol. Projective assessment findings suggest Mr. Souter struggles with recurrent episodes of anxiety, tension, and nervousness as well as incapacity to tolerate too much stress. This precipitates his problems with anger, aggression, and impulse control. In addition, Mr. Souter experiences problems relating to others close to him, in this case, his parents.
>
> TREATMENT RECOMMENDATIONS
> . . . Mr. Souter would benefit from abstaining from alcohol and/or other (non-prescribed) mood- or mind-altering substances. . . . It is recommended Mr. Souter receive a medical evaluation for alcohol dependence problems and be referred for substance abuse treatment. . . . Overall, Mr. Souter's therapy should focus on his remaining abstinent from alcohol use. . . .

On September 9, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 322). Plaintiff participated appropriately in the hour-long session. Plaintiff reported no problems with his parents during the past week. His parents think he talks too loud, but he does not think he is talking loudly. Plaintiff's examination for Medicaid coverage revealed high liver enzymes, and plaintiff was worried about that. "Discussed his drinking and he has been able to cut back especially in the morning. He is now eating breakfast daily and lunch as well. Client was encouraged to continue making efforts to reduce the alcohol intake and he knows that the doctor will want him to quit drinking." Plaintiff said he got upset when he took an ink blot test during his recent psychological evaluation.

On September 17, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 321). Plaintiff participated appropriately in the 50-minute session. Dr. Thornton observed

---

[4]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

that plaintiff was less anxious. Plaintiff said his doctor told him he has an enlarged liver with abnormal liver enzymes, but plaintiff was not worried. Plaintiff had a good week; plaintiff's mother had a nurse who visited to help. Plaintiff "continues to eat out for one meal a day" and reported self medicating less. "He is benefitting from the socialization he is experiencing from going to the local diner for breakfast." Plaintiff had been less agitated with his parents.

On September 24, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 320). Plaintiff participated appropriately in the hour-long session. "He continues to display less anxiety in session and is open and cooperative possibly because this therapist understands his problems and addresses him accordingly." Plaintiff reported crying less when he is alone. Although plaintiff reported being estranged from his children, he reported having a friend he enjoys visiting and said he enjoys going out for breakfast and talking to the waitresses. Plaintiff was diagnosed with fatty liver[5] and although his family has begun telling him he needs to make changes in his diet, he wants to hear that from a doctor instead. "He knows he will need to quit drinking and is having a difficult time dealing with so many changes at once." Plaintiff reported not having any anger issues during the previous week.

On October 2, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 319). Plaintiff participated appropriately in the hour-long session. Plaintiff talked about getting Medicaid and continuing to make changes in his drinking patterns. Plaintiff denied being worried about liver problems, although he was diagnosed with having a fatty liver. He denied being as depressed and said he is crying less.

---

[5] Fatty liver, which occurs after acute alcohol ingestion, is generally reversible with abstinence and is not believed to predispose to any chronic form of liver disease if abstinence or moderation is maintained.
http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/hepatology/alcoholic-liver-disease/

On October 6, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 318). Plaintiff participated appropriately in the hour-long session. Plaintiff began medication for high blood pressure. "This is an improvement that client will agree to take medications at all." Plaintiff's liver enzymes were high and his doctor suggested he may need to go to a specialist. "He continues to say he is drinking less but he does not seem to be ready to ask for help to quit drinking. At this time, there has not been a recommendation from a medical doctor for him to quit. Client continues to say he has had good experiences in life and is not so concerned about making any changes to further his life." Plaintiff reported that he had been controlling his anger and walking away when he father made him angry.

On October 14, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 317). Plaintiff's sister, who was visiting from Florida, came as well. Plaintiff participated appropriately in the 70-minute session. Plaintiff's sister was concerned about plaintiff's use of alcohol. Plaintiff indicated he was using the same or less alcohol, but he was not increasing his consumption.

On October 23, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 316). Plaintiff participated appropriately during the hour-long session. Plaintiff reported having gotten angry about his parents fussing in the car about not having what they needed for his mother's oxygen tank prior to going out to dinner. Dr. Thornton reminded plaintiff that his parents, who were 85 and 84, could not help their forgetfulness. Plaintiff continued to drink alcohol. "He was not indicating he was ready to make any changes in further adjustment of drinking patterns. Client asked about what he needed to do about getting the information to his lawyer concerning mental health treatment."

On October 30, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 315). Plaintiff participated appropriately in the hour-long session. "Client talked about his current

issues and brought in a form to fill out for the lawyer concerning disability." Plaintiff reported that he had not been agitated throughout the last week. His parents' lot sales had picked up and he was pleased about them selling. Dr. Thornton talked to plaintiff about his use of alcohol, and he said he was using less alcohol but not interested in going to treatment. Dr. Thornton noted "improvements as far as anger" with decreasing his alcohol consumption.

On November 6, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 313-314). Plaintiff participated appropriately in the hour-long session. Plaintiff had gone to talk to the postmaster about changing the way the mail is delivered in his parents' housing development. Plaintiff was not very calm with him and slammed the door upon leaving. "He seemed to be calm" and told happy stories about when he used to work in the fields with his grandfather. "Client is cooperating in session. This therapist is still encouraging help with self medicating and will continue to help client be motivated to seek appropriate medication for depression and anxiety. He does well to have somewhere to come and talk about his feelings. Per his parents' report he is improving."

On November 13, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 311-312). Plaintiff participated appropriately in the 70-minute session. Plaintiff had met with the postmaster to try to get the post office to deliver mail on both sides of the road; however, the postmaster indicated it would require extra driving by the mail carriers. Plaintiff stated that he was ready to cease participating in any of the activities to help his parents because he does not have the ability to work with others in a manner that is productive. Plaintiff said that he likes himself and he likes the way others respond to his behaviors most of the time. "This therapist told client we needed to rethink therapy in order to make progress."

On November 20, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 310). Plaintiff participated appropriately in the hour-long session. Dr. Thornton specifically noted

24

that he was "calm" during the session. "Client was pleased to report that more of his mom and dad's lots sold." Plaintiff's anger incident during the week was the result of his ex-wife not calling him back. Plaintiff read a letter Dr. Thornton had prepared to send to plaintiff's lawyer which included a paragraph about plaintiff not wanting to take medication. "Client continues to make small changes such as his willingness to try medications."

On December 4, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 309). Plaintiff participated appropriately in the hour-long session. Plaintiff had agreed to begin medication; however, despite his doctor having written a prescription for him, he had not actually filled it yet.

On December 4, 2009, Dr. Thornton completed a Medical Source Statement - Mental (Tr. at 349-350). She found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

She found that plaintiff is moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

25

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

She found that plaintiff is markedly limited in the following:

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (although she underlined "The ability to maintain socially appropriate behavior" which I take to mean she did not find him markedly limited in the ability to maintain basic standards of neatness and cleanliness)

She found that plaintiff was extremely limited in the ability to accept instructions and respond appropriately to criticism from supervisors. "Extremely limited" is defined as "Impairment level preclude[s] useful functioning in this category." The form includes the following: "In responding, I have <u>excluded</u> from consideration <u>all</u> limitations which I believe result from the patient's drug addiction and/or alcoholism, <u>if any</u>."

On December 8, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 308). Plaintiff participated appropriately in the 50-minute session. "He was reminded that medications and alcohol are not always safe together and [I] asked him to tell his doctor about his use of alcohol. . . . Client is now taking an antidepressant and is making improvements."

On December 18, 2009, plaintiff saw Dr. Thornton for individual therapy (Tr. at 307). Plaintiff participated appropriately in the hour-long session. Although plaintiff had reported that Prozac helped his symptoms, he reported he had forgotten to take it.

On January 8, 2010, plaintiff saw Dr. Thornton for individual therapy (Tr. at 306). Plaintiff participated appropriately in the 50-minute session. Plaintiff had gotten angry at his dad twice, once for going out on the ice to get the mail and another time when he insisted on putting dirty knives back in the knife block. Plaintiff started Prozac.

On January 15, 2010, plaintiff saw Dr. Thornton for individual therapy (Tr. at 305). Although plaintiff claimed to have fallen twice in the last week (once on ice and once when he was trying to kick at his dog to shoo her away), he did not bring his cane to this session. Plaintiff participated appropriately in the hour-long session. Plaintiff said his doctor doubled his dose of Prozac. He reported that it helped him. "Client listens and is in good humor. He does not mind for this therapist to make recommendations and has continued to improve." She told plaintiff he could come every other week instead of weekly from now on.

On February 8, 2010, plaintiff saw Dr. Thornton for individual therapy (Tr. at 304). Plaintiff participated appropriately in the hour-long session. "He reported he had not been taking his medication and that his mother called his intense behaviors to his attention. He seemed to understand that the medications do make a difference and that he does benefit by taking them." On this day he rated his depression a 5 out of 10. Plaintiff's parents had reported that plaintiff is "much better on meds." Plaintiff "[a]ccepted recommendations very well."

On February 22, 2010, plaintiff saw Dr. Thornton for individual therapy (Tr. at 303). Plaintiff participated appropriately in the hour-long session. Plaintiff reporting having had an argument with his parents about his father entering contests with junk mail. He said he thought he might need to increase his medication. Dr. Thornton told him to talk to his prescribing doctor about that, and she encouraged him twice to take his medication as prescribed. Plaintiff's parents had noted a "very positive change in him and had been

enjoying his company." Dr. Thornton wrote, "Client listens to this therapist and is cooperative. He does hot become angry in session." He was told to come back in two weeks.

On March 8, 2010, plaintiff saw Dr. Thornton (Tr. at 405). Plaintiff participated appropriately in the hour-long session. Plaintiff said he was depressed and was going to talk to his doctor about increasing his medication. He said his father was showing signs of confusion. "He did not seem angry today but concerned. . . . He talked about his mother making a decision to move out of the house and have a sale because they could not take care of much stuff anymore. This has him worried and his therapist reminded client that he had an appointment with CPRC[6] services and maybe they could help."

On March 19, 2010, plaintiff saw Dr. Thornton (Tr. at 404). Plaintiff participated appropriately in the hour-long session. Plaintiff's parents were considering moving into assisted living. "Client talked about being somewhat confused as to whether he needed a caseworker. This therapist explained that he more than likely did need caseworker due to all of the things he is finding difficult such as having to move, no money, having to fill out paperwork for disability, etc. He seemed willing after hearing why he needed a caseworker." Dr. Thornton noted that plaintiff had changed a great deal since beginning therapy in that now he was open to receiving help and he was "frightened to not have his mom and dad to assist him as they have been doing." Plaintiff was observed to be pleasant and "willing to follow through with recommendations. This therapist reminded him of CSTAR[7] and the possibilities of getting started in a CSTAR group."

On March 25, 2010, plaintiff saw Dr. Thornton (Tr. at 403). Plaintiff participated appropriately in the hour-long session. Plaintiff talked about his parents' intention to move

---

[6]Community Psychiatric Rehabilitation Center

[7]A chemical dependency program.

28

into assisted living and sell their house.  "He is worried about where he will live due to living in his parents' basement and not having any money.  He has applied for disability, but has not been approved as of yet. . . .  [W]e talked about CSTAR treatment as well. . . . Client has decreased anger and still becomes worried and anxious about his situation."

On March 30, 2010, plaintiff saw William Holt, D.O., complaining of losing his balance (Tr. at 368).  Plaintiff weighed 118 pounds.  He continued to smoke a pack of cigarettes per day.  Blood work was performed.  Plaintiff was assessed with vertigo, elevated liver function tests, and nicotine use.

On March 31, 2010, plaintiff had x-rays of his chest due to a history of cough and his continued smoking (Tr. at 370).  Carl Regier, M.D., found a left upper lobe lung nodule; "carcinoma [cancer] cannot be excluded."  He recommended a CT scan.

On April 5, 2010, plaintiff had an MRI of his brain after having complained of loss of balance and feeling unstable for nine days (Tr. at 369).  Nathan Kester, M.D., assessed moderate diffuse cerebral atrophy and mild generalized cerebellar wasting, which, according to neurologist Kenneth Sharlin, M.D., is caused by chronic alcohol abuse (Tr. at 364).  On that same day, he had a CT scan of his chest due to the nodule found on x-ray (Tr. at 371).  He was assessed with nonspecific pulmonary emphysema and diffuse fatty infiltration of the liver.

On April 8, 2010, plaintiff saw Dr. Thornton (Tr. at 402).  Plaintiff was late because he fell on the stairs coming into the building; however, his brother-in-law, a physician, was there and helped him into the room.  The therapist encouraged him to use his cane.  Plaintiff told Dr. Thornton about the discovery of the spot on his lung.  Plaintiff's sister was present and suggested plaintiff get a series of shots for his drinking problem.  Plaintiff asked Dr. Thornton to set it up.

Case 6:11-cv-03465-REL   Document 17   Filed 02/19/13   Page 29 of 55

On April 15, 2010, plaintiff saw Dr. Thornton (Tr. at 401). Plaintiff participated appropriately in the hour-long session. Plaintiff indicated his parents were planning to move into an apartment. Although he was "pissed" at his mom and dad, he was happy for them. "This therapist once again reminded him that he would be able to benefit from case management services."

On April 23, 2010, plaintiff saw Dr. Thornton (Tr. at 400). Plaintiff participated appropriately in the hour-long session. "Client is concerned about his health issues. He wants to put off going to treatment [for alcoholism] until he finds out more of what is going on physically." Dr. Thornton noted that plaintiff was not upset, but he was concerned about not knowing what he was facing with his health.

On April 21, 2010, plaintiff was seen by Brian Kim, M.D., a pulmonologist (Tr. at 375-377, 409-411, 424-426). "He has smoked approximately one pack per day for the last 40 years and does not want to quit smoking at this time. . . . Patient has quite a bit of a smoking habit and the possibility of a malignancy was suspected. . . . He is a social drinker of vodka." Under review of systems, Dr. Kim wrote, "Denies history of depression or hallucinations." Plaintiff weighed 128 pounds. Plaintiff's mental exam was normal including "good concentration." Plaintiff was assessed with left lower lung nodule and chronic obstructive pulmonary disease. Dr. Kim scheduled a PET scan[8] and biopsy to determine whether the

---

[8]"A positron emission tomography (PET) scan is a unique type of imaging test that helps doctors see how the organs and tissues inside your body are actually functioning. The test involves injecting a very small dose of a radioactive chemical, called a radiotracer, into the vein of your arm. The tracer travels through the body and is absorbed by the organs and tissues being studied. Next, you will be asked to lie down on a flat examination table that is moved into the center of a PET scanner—a doughnut-like shaped machine. This machine detects and records the energy given off by the tracer substance and, with the aid of a computer, this energy is converted into three-dimensional pictures. A physician can then look at cross-sectional images of the body organ from any angle in order to detect any functional problems. A PET scan can measure such vital functions as blood flow, oxygen use, and glucose metabolism, which helps doctors identify abnormal from normal functioning organs and

nodule was malignant. "Smoking cessation options were discussed in detail. The risk and health hazards of smoking were explained and patient understood these. The options of pills, such as Chantix and Zyban, NicoDerm patch, Nicorette gum, Nicotrol, and lozenges were presented. The patient will consider these options."

On April 26, 2010, plaintiff saw Dr. Thornton (Tr. at 399). Plaintiff participated appropriately in the hour-long session. Plaintiff was concerned about upcoming doctor appointments -- the lung biopsy and the PET scan. Although Dr. Thornton indicated that plaintiff becomes overwhelmed with paperwork, she wrote, "as usual he denies that he is too worried taking a very 'whatever will be will be attitude.' . . . He is relieved as he was able to trade his truck for one that did not use as much gas. He expressed relief to be moving out of his parents' home."

On April 30, 2010, plaintiff had a PET scan which showed unlikely malignancy in the lung nodule, although because of plaintiff's strong smoking history and the fact that "low-grade malignancies may not demonstrate any abnormality on PET," plaintiff should have a biopsy or at least regular follow up with repeat CT and PET scans.

On May 10, 2010, plaintiff saw Kenneth Sharlin, M.D., a neurologist, with complaints of "imbalance" (Tr. at 363-364). Plaintiff admitted that his nutrition was "not the best" and said he uses alcohol daily. Plaintiff's breath smelled of alcohol. His mental status exam was normal; his gait was normal. He was assess with ataxia[9] and vertigo.[10] "Clearly, Steven

---

tissues. The scan can also be used to evaluate the effectiveness of a patient's treatment plan, allowing the course of care to be adjusted if necessary. Currently, PET scans are most commonly used to detect cancer, heart problems (such as coronary artery disease and damage to the heart following a heart attack), brain disorders (including brain tumors, memory disorders, seizures) and other central nervous system disorders."
http://my.clevelandclinic.org/services/pet_scan/hic_pet_scan.aspx

[9]"Ataxia describes a lack of muscle coordination during voluntary movements, such as walking or picking up objects. A sign of an underlying condition, ataxia can affect your

suffers from alcoholism with all the ramifications of this chronic illness. Long term exposure is toxic to the brain -- cerebellar degeneration is common -- and peripheral nerves. Of course, he has been substituting alcohol for nutrition, as well." Dr. Sharlin noted plaintiff's level of decision making was "moderate complexity". He ordered lab work.

On May 12, 2010, plaintiff saw Dr. Kim who indicated that plaintiff's PET scan and bronchoscopy were negative (Tr. at 421-423). "Unfortunately he still smokes approximately one pack per day". Dr. Kim recommended smoking cessation. He indicated that the lung nodule was stable.

On May 17, 2010, plaintiff saw Dr. Thornton (Tr. at 398). Plaintiff participated appropriately in the hour-long session. He laughed and smiled. "We talked about the need to be consistent with medications."

On May 19, 2010, plaintiff was evaluated by Rita Easterday, M.S., after having been referred by Dr. Thornton for community psychiatric rehabilitation center ("CPRC") services (Tr. at 387-393). Plaintiff did not appear distressed and was cooperative throughout the interview. Ms. Easterday noted that plaintiff "does not see anyone for psychiatric services and medication management. His primary care doctor prescribes his psychiatric medications." Plaintiff was taking Prozac. "He reported his medications are helpful for symptoms relief and denied any side effects from his medications." Plaintiff reported that he had been hospitalized five years ago "for threatening his wife with a gun. Steve denies any suicidal or homicidal ideation or intent in his lifetime." Plaintiff reported an "extensive history of alcohol abuse

---

movements, your speech, your eye movements and your ability to swallow. Persistent ataxia usually results from damage to your cerebellum — the part of your brain that controls muscle coordination. Many conditions may cause ataxia, including alcohol abuse, stroke, tumor, cerebral palsy and multiple sclerosis." http://www.mayoclinic.com/health/ataxia/DS00910

[10]A feeling that the room is spinning.

32

stating he started drinking about four years ago after losing his business. He reported he was an occasional drinker before he lost his business then he started drinking every day. Steve continues to drink alcohol on a daily basis and smelled of alcohol on the day of the interview. . . . He does not smoke cigarettes." Ms. Easterday assessed major depressive disorder, recurrent, moderate; alcohol dependence; anxiety disorder not otherwise specified; and personality disorder not otherwise specified. She found that plaintiff's problems with family were moderate, problems with social network were moderate, occupational problems were severe, housing problems were moderate, economic problems were severe, and problems with daily living skills were moderate. She assessed a GAF of 48.[11]

Ms. Easterday wrote, "The symptoms are . . . not the direct physiological effects of a substance". Oddly, Ms. Easterday's report includes the following: "Steve meets the criteria for Anxiety Disorder Not Otherwise Specified due to **her** reports of prominent anxiety symptoms nearly everyday that do not meet the criteria for any specific anxiety disorder but significantly impair **her** daily functioning. Individual reports experiencing anxiety so significant that Steve reports anxiety symptoms of obsessive, irrational fear and thoughts that debilitate **her** actions." Not only does the report refer to plaintiff as a female three times, it is inconsistent with the rest of Ms. Easterday's report.

"Steve is living in his mother and father house [sic] at this time but has to move. His parents were placed in an assisted living at the Cambridge. His parent's home is up for an estate sale. He has been approved for emergency housing which will be funded by the Kitchen Clinic and will reside at Franciscan Villa. His move in date in [sic] July 1, 2010. Steve has lived independently most of his adult life with no difficulties. . . . Steve has a valid

---

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

driver's license and a vehicle. He reports he is able to meet all his transportation needs on his own without any difficulty. . . . Steve is fully ambulatory and has no problems with mobility. . . . Reportedly, Steve has impairments that limit his ability to participate in vocational and educational activities at this time." None were identified however.

Plaintiff indicated that one of his strengths was his ability to cope fairly well. His weaknesses were a need to socialize with others and "needs treatment for alcoholism." "It is recommended that Steve be referred to a psychiatrist for better management of his psychiatric symptoms. It is recommended that Steve be screened for C-Star and participate in a substance treatment program." She also recommended that plaintiff apply for food stamps.

On May 24, 2010, plaintiff saw Dr. Thornton for individual therapy (Tr. at 397). Plaintiff participated appropriately in the hour-long session. Dr. Thornton observed that plaintiff's mood was calm and she saw no agitation. He had been able to get food stamps. "We are adding the encouragement of substance abuse treatment to the new treatment plan". Dr. Thornton noted that plaintiff is "more calm now that he and his parents are not living together."

On May 26, 2010, plaintiff saw Dr. Sharlin for a follow up (Tr. at 362). Plaintiff's tests for peripheral neuropathy were normal; however, his liver enzyme test was "very, very high and it is tempting to believe, and likely, that his alcoholism is playing a role in his symptoms." His blood pressure was 121/87. His gait was normal. He was assessed with vertigo.

On May 29, 2010, an Individual Treatment and Rehabilitation Plan was prepared by the State of Missouri Department of Mental Health (Tr. at 352-353). It states that plaintiff "continues to receive assistance with mental health stabilization and independent living" through Burrell Behavioral Health. The form indicates that he "continues to be impaired by

34

his mental illness and requires continued services." Plaintiff was provided with an apartment and was directed to attend a community support program such as CSTAR or AA. He was assessed with alcohol dependence and anxiety disorder. Dr. Thornton was listed as his therapist. The form indicates that plaintiff said, "I know I have an alcohol issue but I am not ready to work on that right now." (Tr. at 356).

On June 1, 2010, plaintiff saw Salvador Ceniceros, M.D., at Burrell Behavioral Health after having been referred by Dr. Thornton (Tr. at 384-386). Plaintiff said he had been getting prescriptions for Prozac from his family care provider but "unfortunately is not doing well." This was despite having said to Ms. Easterday 12 days earlier that "his medications [Prozac] are helpful for symptoms relief and denied any side effects from his medications." Dr. Ceniceros noted that plaintiff had "virtually no support from family. He is about ready to go into a homeless shelter." Plaintiff reported that he continued to drink a pint of alcohol "every single day." Dr. Ceniceros performed a mental status exam and noted that plaintiff's judgment and insight were intact, he was oriented times three, his attention and concentration were within normal limits, his memory was intact. He was assessed with generalized anxiety disorder and alcohol dependence. His GAF was 55.[12] Dr. Ceniceros discontinued Prozac and started plaintiff on Citalopram. "We spoke at length about his alcohol use and his need to try to cut back with the full understanding to the effect that at this time it would be very difficult because of potential DT's,[13] but that if he cut back some, it may be of some significant help to his health. He reported he was going to try".

---

[12]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[13]Delirium Tremens - a psychotic condition typical of withdrawal in chronic alcoholics, involving tremors, hallucinations, anxiety, and disorientation.

On June 14, 2010, plaintiff saw Dr. Thornton (Tr. at 396). Plaintiff participated appropriately in the hour-long session. "Client appeared to be doing very well with his changes [i.e., moving to his new apartment.]" Plaintiff was doing well with socialization. He had been invited to a party, went, and enjoyed himself. Plaintiff said he had only become angry one time since moving to this apartment, and he had been able to control his anger.

On June 18, 2010, plaintiff saw Dr. Thornton (Tr. at 395). Plaintiff participated appropriately in the hour-long session. He was calm and no agitation was observed. Plaintiff reported he was getting along at his new residence, except a man and his dog made plaintiff upset. Plaintiff said he was making friends, he had decreased his alcohol intake, and he was much less stressed since moving into his new apartment. "We talked about . . . when he might begin substance abuse rehabilitation services." Dr. Thornton noted that plaintiff had made "major improvements."

On June 24, 2010, plaintiff saw Dr. Ceniceros (Tr. at 382-383). "He is currently on Citalopram, 40 mg daily, and reports that he is doing quite well." Plaintiff's mental status exam was normal. Judgment and insight were intact. His attention and concentration were normal, memory was intact. His mood was euthymic (normal). Gait and station were normal. "No abnormal movements noted." He was assessed with major depression, a GAF of 60,[14] and was told to come back in two months.

On July 14, 2010, plaintiff was seen by Jennifer Arthurs, a nurse practitioner (Tr. at 419). He was assessed with a lung nodule, "COPD/Smoker", and a sinus infection.

On August 12, 2010, plaintiff saw Dr. Thornton (Tr. at 444). Plaintiff participated appropriately in the hour-long session. He was pleasant. Plaintiff said he was doing well and

---

[14]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Case 6:11-cv-03465-REL   Document 17   Filed 02/19/13   Page 36 of 55

was socializing with others. Dr. Thornton indicated that plaintiff needed to make a decision about substance abuse treatment. "He is contemplating substance abuse treatment".

On August 17, 2010, plaintiff saw Dr. Thornton (Tr. at 443). Plaintiff participated appropriately in the hour-long session. His mood was pleasant and cooperative. "His medication seems to be working well." Plaintiff was attending CSTAR but was "not too sold on it". Plaintiff was having casual conversations with his neighbors and was giving another resident a ride to the CSTAR meetings. Plaintiff continued to smoke but said "in time" he would like to work on quitting. Dr. Thornton's plan was to "work on the reduction of alcohol".

On August 10, 2010, plaintiff saw Dr. Ceniceros (Tr. at 441-442). "He is currently on Celexa, 40 mg daily, and he reports that overall he has been doing quite well. Unfortunately, now he is telling me that his alcohol use has been somewhat problematic. He has cut down to half a pint a day". Plaintiff's mental status exam was normal. Gait and station were normal. He weighed 141 pounds. He was assessed with major depression and alcohol dependency with a GAF of 60. Dr. Ceniceros continued plaintiff's Celexa and added Naltrexone "to see if we can help with his drinking."

On August 24, 2010, plaintiff saw Dr. Thornton (Tr. at 440, 475). Plaintiff participated appropriately in the hour-long session. She noted that he was not angry or anxious about life issues. With regard to his life at Franciscan Villa, "He has been loaning money and providing rides for others," Plaintiff was making himself available to help others. Dr. Thornton noted that plaintiff was doing much better now that he did not have to take care of his parents. "He is attending CSTAR and is taking a prescribed medication to help him cease drinking."

37

On August 31, 2010, plaintiff saw Dr. Thornton (Tr. at 474). Plaintiff participated appropriately during the hour-long session. Plaintiff described interactions with two lady friends. Plaintiff said the medication he was taking to stop drinking was working. He indicated that his parents' real estate agent wanted him to drive out to his parents' subdivision to check on a report that a resident was putting up an above-ground pool, but he felt agitated and did not want to go.

On September 1, 2010, Dr. Thornton wrote a letter to plaintiff's disability lawyer (Tr. at 456-457).

> I believe that Steve is unable to work and provide his own income. Steve has exhibited minimal stress tolerance and becomes agitated easily. When Steve becomes anxious or over stimulated, he often becomes agitated and verbally uninhibited. He is doing better since being prescribed medication, but continues to struggle when faced with an overwhelming situation. His anxiety has improved since he has moved to Franciscan Villa, where he has a simple, low anxiety life style. Problems with anxiety and agitation have been a hindering factor through out his life. He has lost jobs and relationships due to his inability to deal with stress. Most of Steve's life he worked for himself and avoided having to deal with others as an employee because of his tendencies to become agitated. His agitation has a quick onset and it has also affected his abilities to work with others even if they were not an employer.

> * * * * *

> . . . It is my opinion that trying to be employed or work with others would be difficult for Steve. It has always been difficult and now, with his decline in physical health and increased emotional problems his abilities are lessened to a greater extent.

On September 9, 2010, plaintiff saw Dr. Thornton (Tr. at 473). Plaintiff had decreased his drinking to a six-pack of beer. He had an example of having gotten angry once since his last visit. Dr. Thornton noted that plaintiff responded in a positive manner during therapy.

On September 23, 2010, plaintiff saw Dr. Thornton (Tr. at 471). "Client presented with information on his SSD [Social Security Disability] and said the court date was not finished because their [sic] was not a vocational expert was not present [sic] because he was

sick. He was 'pissed.'" Dr. Thornton noted that plaintiff was going to CSTAR, the medication to help him quit drinking was "working" as he had decreased to two beers per day. "He is doing well with a decrease in anxiety." Dr. Thornton recommended plaintiff decrease his visits to monthly.

On September 30, 2010, plaintiff saw Dr. Ceniceros (Tr. at 469-470). "He is currently on Celexa, 40 mg daily; ReVia, 25 mg daily. Overall he is doing well. When he first started the ReVia, he was able to cut his drinking down to zero and had no desire and was doing very well. Then he slowly started drinking again and is currently drinking beer. He says three to four cans per day. We talked at length about his need to stop 100 percent". Plaintiff's mental status exam was normal. His mood was euthymic. His gait was normal. He weighed 137 pounds. He was assessed with major depression and alcohol dependency with a GAF of 60. "At this point, all we can do is continue pushing him to try quit drinking altogether."

On October 5, 2010, Frances J. Anderson, Psy.D., a clinical psychologist, performed a psychological evaluation of plaintiff at the request of Disability Determinations (Tr. at 449-453). Plaintiff continued to smoke a pack of cigarettes per day. He said he began taking medication to make him stop drinking about a month earlier. "He reportedly has 'been drinking all my life, until I quit a couple of months ago, would drink a pint of vodka a day. Quit drinking a month ago, don't know the date." Initially plaintiff said he was not being treated for anything, but then he said he was being treated for depression and anxiety. "Medical records indicated he had been recommended to seek psychotherapy, being denied a disability claim, reportedly treated for depression, relational problems, alcohol abuse, nicotine abuse and personality disorder NOS. Psychotherapy notes did not indicate the extent to which his drinking behaviors affected his other reported psychological symptoms."

39

Plaintiff smelled of cigarette smoke. He smiled and interacted appropriately. "It was interesting to note, sometimes he could hear adequately, when the evaluator was speaking in a normal tone, other times requesting the evaluator speak loudly." He was cordial and cooperative.

Plaintiff said that with medication, he has no symptoms of depression. Plaintiff claimed to forget things a lot "but did not cite examples of such." Plaintiff said that people make him angry, "thought was unable to give examples of such other than to say, 'I don't like stupid people.' It is unclear as to the extent of his anger problems being related to his chronic alcohol abuse."

> The claimant does not perceive he can be employed, stating "can't work, because don't get along with people, just don't get along with them, don't like to take orders, always been self employed, no longer self employed, because I lost my trucks -- bank took them, because I was behind on payments." He stated he couldn't do a job with minimal social contact, because "I don't like stupid people." He sees his primary problems as "vertigo," though also indicated this problem had been resolved after working with a physical therapist. Psychologically, he sees his primary problems as "people make me angry, depression, anxiety."

* * * * *

> EDUCATIONAL AND OCCUPATIONAL HISTORY:
> . . . He described previous employments as having worked for Cooper Trucking for two years, Lowe's for three years, and was self employed as a carpenter for four years. Reportedly, he was able to adequately manage previous job expectations. He denied having been fired from any employment.

> DAILY ACTIVITIES
> The claimant is able to perform self-care, including dressing and bathing, and takes his medications as prescribed. He is reportedly able to perform meal preparation, laundry, grocery shopping and household cleaning. He can use the telephone and drive a car. He reads the newspaper or magazines, as well as manages his money and pays his bills. He reportedly can perform his daily activities without assistance and in a timely manner. He spends some social contact with friends and family. He arises and retires at variable times. In a typical day, he does his household chores, watches TV, walks his dog, sees his parents and takes a nap.

Dr. Anderson administered the WMS-III, Rey's 15-item Test, and a mental status exam.

Dr. Anderson wrote:

It would appear the claimant can understand and remember at least moderately complex instructions without difficulty. His ability to sustain concentration, pace and persistence would appear to be adequate, for at least moderately complex/complex tasks. His ability to socially interact would appear adequate. His ability to adapt would also appear adequate.

She assessed:

Axis I:     Alcohol dependence, reportedly in early remission of less than one month, though reportedly one or two months
            Depressive disorder reportedly managed with medications

Axis II:    Diagnosis deferred

Axis III:   History of vertigo

Axis IV:    Psychosocial stressors: Occupational problems: Unemployed; Problems related to social environment: questionable support system; Economic problems: inadequate finances

Axis V:     GAF: 62

On October 14, 2010, plaintiff saw Dr. Kim, his pulmonologist (Tr. at 459-460).

Plaintiff continued to smoke a pack of cigarettes per day. "He has never tried Chantix, but he is not committed to quitting smoking yet." Plaintiff denied dizziness, history of stroke, and history of depression. He was assessed with a sinus infection, chronic obstructive pulmonary disease, and "smoker." Dr. Kim recommended that plaintiff stop smoking.

On October 15, 2010, Frances J. Anderson, Psy.D., completed a four-question form (Tr. at 448). She found that plaintiff could understand, remember and carry out at least moderately complex tasks on a sustained basis if he were to abstain from alcohol. She found that plaintiff could make at least moderately complex work related decisions on a sustained basis if he were to abstain from alcohol. She found that plaintiff could respond appropriately to supervision, co-workers and usual work situations in a moderately complex work setting on a sustain basis if he were to abstain from alcohol. And she found that plaintiff could deal with routine changes in a moderately complex work setting on a sustained basis if he were to

abstain from alcohol.

On October 29, 2010, plaintiff saw Dr. Thornton (Tr. at 467). Plaintiff reported having a stressful interview with someone from Social Security. Dr. Thornton noted that plaintiff had not been becoming agitated often. "He seemed to have a good amount of control over his emotions". Plaintiff reported having decreased his alcohol intake. He was encouraged to work on quitting drinking. "He continues to be pleased with living at Franciscan Village and would like to stay there if possible."

On November 8, 2010, plaintiff saw Dr. Thornton (Tr. at 466). "I assessed client and asked him about anger and he reported that he is doing well." He reported having gone to Karaoke with friends. He continued to drink "a minimal amount" of alcohol. "His parents have reported to me that he is doing very well."

On November 24, 2010, plaintiff saw Dr. Ceniceros (Tr. at 464-465). Plaintiff was on Celexa and ReVia daily for alcohol dependency. "He reports that his mood is starting to get bad again. He is starting to become quite depressed and dysphoric." Plaintiff's mental status exam was normal, except he had a very anhedonic (absence of ability to experience pleasure) and anergic (lack of energy) mood. His gait was normal. He weighed 145 pounds. He was assessed with major depression, alcohol dependency, and a GAF of 50. Dr. Ceniceros switched plaintiff to Cymbalta.

## C.    SUMMARY OF TESTIMONY

During the September 16, 2010, hearing, plaintiff testified. Vocational Expert Michael Lala was sick and unable to attend and therefore a supplemental hearing was scheduled.

At the time of the hearing plaintiff had lived alone in an apartment for the past six months (Tr. at 37). Prior to that he lived with his parents (Tr. at 37). He and his wife moved into a house owned by his parents, then he got a divorce and his wife moved out and his

parents moved back in with him (Tr. at 54). Plaintiff has Medicaid coverage (Tr. at 38). Plaintiff has no income and no bills -- his rent is subsidized and he gets free meals (Tr. at 38).

Plaintiff has a high school education and two years of college (Tr. at 38). Plaintiff worked as a dump truck driver in 1996 and 1997 hauling sand and gravel (Tr. at 38-39). He left that job because if the truck broke, his boss made him fix it (Tr. at 39). In 1998 he did long-haul trucking (Tr. at 39). He left that job because he got tired of it (Tr. at 39). In 1998 he began a customer service job at Lowe's (Tr. at 39). He left that job in 2001 because he "got into it with management" (Tr. at 40). From 2002 through 2004 plaintiff was a self-employed carpenter (Tr. at 40). In 2005 he went back to work for the dump truck company (Tr. at 40). He stopped working there because he bought his own truck (Tr. at 40). Although he testified he drove his own truck after that, he did not report any earnings in 2006, 2007 or 2008 (Tr. at 40). He then testified, "Actually, I didn't drive it. I'd had my stroke, and I didn't drive it. I had drivers hired." (Tr. at 41).

Plaintiff gets dizzy from vertigo every day (Tr. at 41). He used to fall from it until physical therapy taught him out to "work around it" (Tr. at 41). He said the last time he fell because of dizziness was "last week" (Tr. at 41). Since physical therapy, he falls about once a week (Tr. at 41). Before physical therapy, he fell daily (Tr. at 42). He began physical therapy a couple months before the hearing, and when asked when he finished physical therapy, he said, "They did two eight-week sessions." (Tr. at 42).

Plaintiff had a stroke in 2005 and continues to have weakness in his left arm and left leg from that (Tr. at 42). He can stand only for about 15 minutes due to the weakness (Tr. at 42). He can lift 50 pounds, but he cannot carry it (Tr. at 43). He can lift and carry about 20 pounds (Tr. at 43). He could not lift and carry that much if he had to do it for about a third of the day (Tr. at 43).

Plaintiff's anger has caused him problems in the past (Tr. at 43). He was asked for examples, and he gave two, both from when he worked at Lowe's (Tr. at 43-45). At Lowe's the assistant manager did not like him. He moved into a management position in commercial sales and he had access to the actual cost. One day the store manager told plaintiff to sell someone anything he wanted "at cost" because he had been "broken into and robbed." He did as he had been told, but the next day the assistant manager yelled at him for selling everything at cost and she sent him home. He did not argue with her about it -- he quit (Tr. at 43-44). He believes had he not quit he would have been fired (Tr. at 43). Another example was when someone who did $500 a month in business at Lowe's was no longer allowed in the store. Plaintiff was told by the cashier that she had been instructed to let someone know if the person came in. Plaintiff confronted the person who had told the cashier that, and that person said it had come from "up above." Plaintiff got mad because "they" hadn't come to see him (Tr. at 45). Plaintiff did not give any examples of anger having caused him problems around the time of his alleged onset date or after his alleged onset date. He stopped working at Lowe's in 2001 -- approximately seven years before his alleged onset date.

Plaintiff has problems getting along with a few of the people he lives around (Tr. at 45). He does not get into arguments with people though. Someone tried to start a false rumor about him without coming to see him about it. He confronted her about it (Tr. at 45). When asked whether people irritate him more than they seem to irritate others, he said, "No" (Tr. at 45). He does get irritated easily; and when asked to give an example, he said that when people start rumors it irritates him (Tr. at 46). Plaintiff believes he has trouble concentrating because he cannot remember names (Tr. at 46). It is not difficult for him to stay focused on a two-hour movie (Tr. at 46).

44

Plaintiff's housekeeping is done by the people who run the residence and they will also do his laundry, but he chooses to do his own laundry (Tr. at 46-47). He does not go to the grocery store because he gets fed for free in the cafeteria where he lives (Tr. at 47-48).

Plaintiff's parents moved into a retirement community and therefore plaintiff was about to become homeless (Tr. at 48). Therefore, the Burrell Clinic recommended he move into this residential program (Tr. at 48). Plaintiff's parents are 85 years of age and have a housing development going (Tr. at 48-49). Plaintiff helped oversee it and he kept it mowed (Tr. at 49). He no longer mows; his role is limited to pricing the lots (Tr. at 49). The real estate agent will call plaintiff and say there is an offer, and he will decide to accept the offer or hold out for a higher price (Tr. at 49-50). Plaintiff used to go out and check on the lots when houses were being built (Tr. at 51). The last time he did that was "probably late last year." (Tr. at 51). He would drive through the area and if there was any trash that had been thrown on the lots, he would contact the man that takes care of it and tell him to get that cleaned up (Tr. at 51-52). Plaintiff, his sister and his parents are all trustees of a trust which holds the housing development, but only his parents make decisions about the housing development (Tr. at 55-56).

Plaintiff is taking Micardis for his blood pressure and Celexa for depression (Tr. at 52). He had been taking Celexa for about three months (Tr. at 52-53). Prior to that he was on some other medication for about a year (Tr. at 53).

Plaintiff has a driver's license (Tr. at 53). For about a year he had no license (Tr. at 53). When asked whether that was when he was "driving for Mr. Cooper" plaintiff said, "No. No, I was driving. . . . I was driving -- I was driving for myself. I had -- I had my own truck. I did drive it for a while." (Tr. at 53). Plaintiff continues to drive a car about 50 miles per week (Tr. at 54). He goes to visit his parents, goes to Burrell, and goes to drug and alcohol abuse

Case 6:11-cv-03465-REL   Document 17   Filed 02/19/13   Page 45 of 55

treatment (Tr. at 54). He has been going to the drug and alcohol abuse treatment meetings for about two months -- they are an hour long once a week (Tr. at 54-55). Plaintiff was asked when he last had a drink, and he said, "This morning. It was a beer." (Tr. at 55). He last attended an Alcoholics Anonymous meeting about 15 years ago (Tr. at 55).

The supplemental hearing was held on December 20, 2010.

1.    **Plaintiff's testimony.**

From 1995 to 1997 and again in 2005 plaintiff worked for Gary Cooper as a truck driver hauling gravel and sand (Tr. at 24-25). In 1998 he worked as a long-haul truck driver (Tr. at 25). From 1998 to 2001 he worked at Lowe's in customer service waiting on customers at the commercial sales desk (Tr. at 25). He lifted 98-pound bags and 50-pound bags (Tr. at 28). From 2002 to 2004 he was a self-employed carpenter (Tr. at 25). Plaintiff owned dump trucks and earned money two years earlier renting them out; he had two drivers (Tr. at 26). He filed tax returns for those years, but he testified that he did not make any money because the bank took his trucks (Tr. at 26).

2.    **Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. The first hypothetical came from the Medical Source Statement of Cheryl Thornton, Psy.D., dated December 4, 2009 (Tr. at 29-30). The vocational expert testified that such a person could not work (Tr. at 30).

The second hypothetical involved a person who could stand and walk eight hours a day; sit eight hours a day; lift 50 pounds occasionally and 25 pounds frequently; could occasionally climb stairs, kneel, crawl, and squat; should avoid heights, hazardous unprotected moving equipment, extreme temperature, humidity, dust, fumes, and poor ventilation; would have difficulty in a high-stress job such as one requiring fast-paced activity

or requiring the person to meet strict and explicit production quotas, deadlines, schedules, or changes in the work setting of an unusual nature; the person may at times have difficulty sustaining a high level of concentration such as sustained precision or sustained attention to detail; would be able to carry out a simple routine or a simple repetitive task; and might have trouble in a job requiring him to interact with the public and a job requiring close personal interaction with coworkers (Tr. at 30). The vocational expert testified that such a person could not do plaintiff's past relevant work (Tr. at 31). However, the person could work as a hand packager, DOT 920.587-018, with 1,200 in Missouri and 400,000 in the country; a mixing machine operator, DOT 680.685-066, with 2,300 in Missouri and 101,000 in the country (Tr. at 31). Both jobs are unskilled (Tr. at 31).

If the person would need a cane for prolonged periods of walking the person could not do either of those jobs (Tr. at 31).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on January 27, 2011 (Tr. at 8-20). Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2010 (Tr. at 10).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 10).

Step two. Plaintiff suffers from the following severe impairments: history of cerebrovascular accident, hypertension, chronic obstructive pulmonary disease, allergic rhinitis, lung nodule, major depressive disorder, and alcohol dependence (Tr. at 10). Plaintiff's fatty infiltration of the liver is not a severe impairment (Tr. at 10).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11).

Step four.  Plaintiff retains the residual functional capacity to lift and carry 25 pounds frequently and 50 pounds occasionally.  He is able to sit 8 hours each day; stand/walk for 8 hours each day; and can occasionally squat, kneel, crawl and climb stairs.  He is unable to perform work involving exposure to hazards such as unprotected heights, involving exposure to extremes of temperature, to extreme levels of humidity, dust or fumes or to extremely poor ventilation.  He is unable to perform work involving close personal interaction with coworkers or involving any interaction with the general public.  He can maintain the level of attention required for sustaining a simple routine or simple repetitive tasks, but cannot sustain a high level of concentration such as sustained precision or attention to detail.  He is unable to perform high stress work such as that which involves fast-paced activity, strict and explicit production quotas, deadlines, or schedules or involving unusual changes in the work setting (Tr. at 11-12).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 4).

Step five.  Plaintiff can perform other jobs available in significant numbers, such as hand packager or mixing machine operator (Tr. at 19).  Therefore, plaintiff is not disabled.

## VI.    OPINION OF DR. THORNTON

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Thornton, plaintiff's treating psychologist.  A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of

48

examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Thornton:

> Cheryl Thornton, Psy.D., a treating psychologist, opined on December 4, 2009, that the claimant had moderate or marked limitations in many areas of basic work-related mental functioning. Dr. Thornton's progress notes show that during their sessions the claimant complained primarily of conflict with family members, rather than more overt symptoms of mental illness. In February 2010, the doctor noted that the claimant stated that his parents had noted a "very positive change in him," apparently since starting mental health counseling, despite the fact that he had not been taking his psychoactive medication as prescribed. . . . During [January 2010] Dr. Thornton noted that the claimant was taking his medication as directed and was showing some improvement. In December 2009, she had noted that the claimant was taking Prozac fairly regularly and reported that it decreased his anxiety. . . . Dr. Thornton also stated in December 2009 that the claimant had just begun to take Prozac . . . and he already appeared "more calm." . . . The claimant told Dr. Thornton in October 2009 that he was drinking alcohol daily and she noted that he did not seem to be ready to ask for help in quitting. . . .

> Dr. Thornton noted in June 2010 that the claimant was doing well, had been able to decrease alcohol intake, was making friends at a new apartment building where he was living and was "very positive about his life." . . .

> On September 1, 2010, Dr. Thornton stated that she believed the claimant was unable to work due to "minimal stress tolerance" and becoming "agitated easily." However, she acknowledged that his condition improved with medication and with a "simple, low-anxiety life style" and that he would "struggle" only when "faced with an overwhelming situation." . . . Dr. Thornton's check-mark assessment and conclusions are unexplained by any reference to specific clinical findings or measurements or any organized or structured approach to evaluating mental functional capacity. She records little other [than] claimant's subjective complaints and history and provides no basis on which to form the opinions and assessments given. They do not warrant deference.

(Tr. at 13-16).

The evidence in the record supports the ALJ's finding that Dr. Thornton's opinion is not supported by her own records or the rest of the record. Dr. Thornton never once observed plaintiff exhibiting anger. That report came from plaintiff's parents. And the ALJ correctly noted that plaintiff's anger issues were almost exclusively related to his relationship with his

49

aging parents. Additionally, on June 30, 2009, Dr. Thornton began talking to plaintiff about stopping drinking. Through the end of the medical records with her, Dr. Thornton continued to suggest to plaintiff that he seek alcohol abuse treatment. He did not do it until his living situation required that he participate in treatment and even then he said he was not sold on it and continued to drink during the entire span of the medical records in this case.

During every session, Dr. Thornton noted that plaintiff participated appropriately. All of her sessions were approximately an hour long. She saw plaintiff dozens upon dozens of times and never once observed him to be angry or to have any difficulty interacting with her or anyone in her office. He never reported having problems interacting with anyone but his parents except on one occasion he reported becoming angry with the postmaster when he could not get the post office to change the way mail was delivered in his parents' development. Nothing in Dr. Thornton's records shows observations of behavior that is consistent with the opinion at issue.

Dr. Thornton's observations of plaintiff were consistently normal: On June 16, 2009, he was pleasant, he joked and he laughed. On June 30, 2009, he was smiling. On July 17, 2009, his parents said he was more pleasant. On July 31, 2009, he was smiling. On August 4, 2009, his parents said they saw improvement and Dr. Thornton noted that plaintiff was responding well to her. On August 11, 2009, she observed him joking with her staff. On September 17, 2009, he indicated he had been going out to eat every day. On September 4, 2009, he said he was enjoying talking to the waitress when he ate out, and he was enjoying visiting with a friend. On October 6, 2009, she noted he said he had been controlling his anger. On November 6, 2009, she observed that he was calm and cooperative and his parents said he continued to improve. On November 20, 2009, he was calm. It was at that point that Dr. Thornton completed the Medical Source Statement indicating that plaintiff was extremely

limited in his ability to accept instructions and respond appropriately to criticism from supervisors. She found that he was markedly limited in his ability to complete a normal workday, interact appropriately with the general public, get along with coworkers or peers, maintain socially appropriate behavior and work in coordination or proximity to others. There is simply nothing in her records to support this, and what she did write in her records completely contradicts this opinion.

On January 15, 2010, she noted that plaintiff listens and is in good humor and she recommended he decrease his visits to every other week from weekly. This was just a couple weeks after she prepared the incredibly limiting Medical Source Statement. On February 8, 2010, plaintiff's parents said he was much better on medication and they had seen a very positive change. On February 22, 2010, Dr. Thornton noted that plaintiff listens, is cooperative, and does not become angry. On March 19, 2010, she noted that he was pleasant. On May 17, 2010, he laughed and smiled. On May 24, 2010, he was calm, "no agitation." She specifically noted that he was more calm "now that he and his parents are not living together." On June 14, 2010, she noted he was doing very well, and that he had gone to a party and enjoyed himself. On June 18, 2010, he was calm and she observed no agitation. On August 12, 2010, he was pleasant, doing well, socializing. On August 17, 2010, he was pleasant and cooperative. On August 24, 2010, he was not angry or anxious about life issues. He was doing much better "now that he doesn't have to take care of his parents." It was at that point that Dr. Thornton wrote the letter of September 1, 2010, stating that plaintiff could not work because he became agitated easily. She stated that most of his life plaintiff had worked for himself in order to avoid having to deal with others; however, that is clearly not true as plaintiff spent more time working in customer service at Lowe's than he did working for himself. She indicated that plaintiff's marriages had all ended due to his inability to deal

51

with stress; however, plaintiff had told Dr. Lutz that his first marriage ended because his wife was involved with other men, and his second marriage ended because "you couldn't give her enough money." His third marriage ended when he told her to leave after he participated in a substance abuse program. He also indicated that one of his ex-wives was abusive (Tr. at 263).

On September 9, 2010, Dr. Thornton noted in her treatment records that plaintiff had responded positively during therapy. On September 23, 2010, she noted that he was doing well, and she recommended that he decrease his visits to monthly. On October 29, 2010, she observed that plaintiff was not becoming agitated and that he had a good amount of control over his emotions. On November 8, 2010, she asked plaintiff about his anger -- no doubt because he had not mentioned it in some time as it does not appear in her records -- and he said he was doing well. His parents also reported that plaintiff was doing very well.

In addition to Dr. Thornton's opinion being unsupported by her own records, it is unsupported by the rest of the record. In a Function Report dated February 15, 2009, plaintiff reported that he has no problems getting along with others. He said he had no problems remembering, completing tasks, concentrating, understanding, following instructions, or getting along with others. He reported he had never lost a job because of problems getting along with others. He said he was able to handle changes in routine well, and he was able to follow instructions well.

On March 21, 2009, Dr. Zeimet found plaintiff to be pleasant. Plaintiff did not report depression or anger. Dr. Zeimet observed that plaintiff was not anxious or nervous and found that plaintiff could follow simple instructions.

On April 16, 2009, plaintiff told Dr. Lutz that he was getting irritated easily with his parents and sister and that his irritation caused problems "primarily at home." He reported that he was anxious about financial issues and that he had no depression. He described his

psychological treatment as being a result of problems between him and his parents. He said he left work because he got caught with an expired physical exam, not due to stress or agitation or anger. He was observed to be cooperative. Dr. Lutz found that plaintiff had very few mental limitations.

On April 28, 2009, Dr. Bland found that plaintiff's mental impairment is not severe.

On August 20, 2009, plaintiff told Dr. Faulkner that getting angry was unusual for him. She found that he was not disabled.

On August 29, 2009, Dr. Hogan observed that plaintiff was cooperative and showed only mild irritation when he was asked why ink blots looked a certain way. The only recommendation from Dr. Hogan was that plaintiff stop drinking.

On May 19, 2010, Ms. Easterday observed that plaintiff did not appear distressed, he was cooperative, and he smelled of alcohol.

On June 24, 2010, Dr. Ceniceros noted that plaintiff was doing quite well. On August 10, 2010, Dr. Ceniceros noted that plaintiff was doing quite well. On September 30, 2010, Dr. Ceniceros noted that overall plaintiff was doing well and that his mood was normal.

On October 5, 2010, Dr. Anderson observed that plaintiff smiled, was cordial and cooperative and he interacted appropriately. Like the other doctors, she found that plaintiff had very little limitation from any mental impairment.

All of these observations -- by Dr. Zeimet, Dr. Lutz, Dr. Bland, Dr. Faulkner, Dr. Hogan, Ms. Easterday, Dr. Ceniceros, and Dr. Anderson -- are inconsistent with the opinions rendered by Dr. Thornton.

Dr. Thornton is a specialist, she saw plaintiff regularly and for a lengthy period of time. However, the ALJ was justified in discounting her opinion in the Medical Source Statement and her letter to plaintiff's attorney because the opinions therein are not supported

by her own treatment records, are completely contradicted by plaintiff's own statements in his administrative paperwork, are contradicted by every other doctor's records in the file, and appear to be geared toward nothing other than securing disability benefits for plaintiff. Plaintiff's motion for judgment on this basis will be denied.

## VII.   RESIDUAL FUNCTION CAPACITY

Plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity because he improperly discounted the records from the Burrell treatment center, i.e., the records of Dr. Thornton.  This argument is without merit.

The ALJ found that plaintiff can lift and carry 25 pounds frequently and 50 pounds occasionally.  Plaintiff stated in his Function Report that he can lift and carry 50 pounds.  Dr. Zeimet indicated plaintiff had no lifting restrictions.

The ALJ found that plaintiff is able to sit eight hours each day.   Plaintiff indicated in his Function Report that his condition does not affect his ability to sit.  Dr. Zeimet found that he could sit for eight hours.  No other doctor addressed or limited his ability to sit.  Plaintiff indicated on multiple occasions that he sits at his computer for five to six hours at a time.

The ALJ found that plaintiff could stand/walk for eight hours each day.  Plaintiff stated in his Function Report that his condition does not affect his ability to stand.  Dr. Zeimet found that plaintiff can stand for eight hours a day.  No other doctor addressed or limited his ability to stand or walk.

The ALJ found that plaintiff is unable to perform work involving close personal interaction with coworkers or involving any interaction with the general public.  Plaintiff argues that he testified he had general anger problems with supervisors and/or employers as well, and his "anger issues were very prominent in his treatment sessions."  This issue was dealt with above and I find it to be without merit.

The medical records consistently show that plaintiff's problems are caused by alcohol abuse and that despite being told to stop drinking, he continued to drink heavily even up to the day of his administrative hearing. He was told to stop smoking, and he even had a lung cancer scare, but he continues to smoke. Plaintiff consistently stated that he was not interesting in stopping smoking or drinking, and he did not begin medication to assist him with his drinking or begin attending alcohol abuse meetings until he was essentially forced to do so as a condition of living at the Franciscan Village. The record is replete with statements by treating doctors that plaintiff's symptoms and problems were the result of his continued severe alcohol abuse. Dr. Thornton's opinion is unsupported by the record and the ALJ properly discounted it. The record establishes that the ALJ relied on the substantial credible evidence in the record as a whole in formulating plaintiff's residual functional capacity.

## VIII.   CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 19, 2013

Case 6:11-cv-03465-REL   Document 17   Filed 02/19/13   Page 55 of 55